THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* TIMOTHY TATE, Defendant-Appellant.

Fifth District   No. 79-378

Opinion filed March 20, 1981.

---

[1] Hon. Charles E. Jones, J., replaces Hon. Dorothy W. Spomer, J., who retired after oral argument.

John H. Reid and John W. McGuire, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Nicholas G. Byron, State's Attorney, of Edwardsville (Martin N. Ashley and Nicholas V. Svalina, both of States Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE KASSERMAN delivered the opinion of the court:

Defendant, Timothy Tate, was convicted by a jury in the circuit court of Madison County of the following crimes: rape; deviate sexual assault; aggravated battery; aggravated kidnaping; unlawful restraint; burglary; and armed violence. Concurrent prison sentences were imposed ranging from seven years for burglary to 40 years each for rape and deviate sexual assault. Defendant was not sentenced on the unlawful restraint conviction. On appeal defendant contends that the evidence was insufficient to sustain the convictions beyond a reasonable doubt, that he was denied effective assistance of counsel, and that he was improperly convicted of both aggravated kidnaping and unlawful restraint.

The evidence introduced at trial by the State detailed the events occurring during the early morning hours of February 23, 1979, which gave rise to the instant offenses. A teen-age girl had spent the evening babysitting at Mrs. Frances Abel's residence in Alton, Illinois. At approximately 2:30 a.m., the girl completed a telephone call to her fiance and retired, sleeping on a couch in the living room of the home of Mrs. Abel. As something brushed against her leg, she awoke and noticed a person carrying a bag who was bending over her as she lay on the couch. The person informed her that if she did not remain quiet she would be killed. The intruder reached up the girl's skirt and removed her underpants. He left her momentarily and went through other rooms in the house. When he returned, he told her that she would have to accompany him for a block or two. She was led outside through a window. It was a cold, dark, and foggy night. The girl was barefoot and was clad only in a skirt and blouse. A blanket covered her head. During the time the intruder was in the house the girl was unable to see his face.

As the intruder led the girl outside, the blanket continuously covered her face, preventing her from seeing him. The intruder took her to a soccer field a short distance away from the Abel home and raped her. Next, he forced her to walk to the far end of the field and lean over a wooden railing. There she was subjected to anal intercourse. While in that leaning position, she was able to see between her legs and observed the skin of her assailant's exposed lower legs. She was able to discern that her assailant was a light-complexioned black. She was pulled from the railing only to be forced to lean over it again. At this time she was choked with a leather strap until she lost consciousness. After the girl revived, she was pulled to her feet by her assailant. At this moment the blanket slipped from her face and she was able to see her assailant from the waist up. She noticed that he was wearing a black jacket. This view also permitted her to observe his face for several seconds before the blanket was placed over her head once again. The assailant then led her away from the field up a steep gravel hill, which she sensed to be a street. He took her to the rear of a house where she was ordered to sit down on a concrete slab. When they rounded the corner of the house, she thought her assailant threw something against it. Her assailant wrapped a green garden hose around her feet and told her not to leave or she would be killed. He was gone no longer than six seconds; and when he returned, the girl was taken back toward the soccer field by a different route. In a field beyond the soccer field, she was raped again. The girl also was forced to engage in oral sex with the assailant; however, she was unsure at what point in her ordeal this occurred. After the rape in the field, she was commanded to place her hands above her head. When she complied, the assailant attempted to cut her throat with an object she thought to be a knife. She grabbed for the object and a struggle ensued. The victim sustained an even laceration across the fingers of her left hand when she gripped the object. After pleading for her life, she was ordered to sit down and count to 200. She watched the back profile of the assailant as he left her; and when she thought it was safe, she fled to Mrs. Abel's home.

Mrs. Abel awakened to the sounds of the girl pounding on the front door and admitted her into the house. The girl was drenched, bloody, and hysterical. Mrs. Abel guessed the time to be approximately 3 a.m. when she came to the door. Mrs. Abel immediately telephoned the police, and Officer Moore arrived minutes later. His report of the incident reflected that his time of arrival was 4:21 a.m. The girl estimated that she awoke to find the assailant in the Abel home at about 3 a.m. and that 1½ hours elapsed from then until she returned to the Abel home.

The girl was admitted to the emergency room of the Alton Memorial Hospital for treatment. The examining physician discovered multiple abrasions and bruises on her neck. Her neck was slightly lacerated on the

left side as well. The girl sustained multiple scrapes and abrasions on her posterior, thighs, and knees. A gynecological examination revealed swelling, redness, rupture of the hymen, and some bleeding. According to the doctor, these latter symptoms suggested recent sexual intercourse. A test performed to determine the presence of sperm proved negative; however, the nurse who conducted the test testified that it was not unusual for a rapist to fail to ejaculate.

After her treatment at the hospital, the victim was interviewed by the police. She described her attacker as being a light-complexioned black man of medium build, between 5 feet 11 inches and 6 feet 1 inch in height. She believed he was not over 24 years of age. At trial she identified defendant as he man who assaulted her. She testified at trial that defendant was thin and was between 6 feet and 6 feet 2 inches in height. She described to the police the house to which she was taken as being white with two stories. According to her, in the back of the house were a concrete slab, a green garden hose, two trash cans, and something resembling a trash burner. At trial she stated that the house was "tan brick" in color. She also described the route she took and mentioned the steep street she walked up before arriving at the house.

Officer Galloway testified that after he spoke with the girl, he and Officer Logan drove around the area of the soccer field and located a house matching the description supplied by the girl. The house was at 2719 Powhatten Street, about one block from the soccer field. Officer Galloway described the house as being light-colored beige with white trim in color, with a concrete slab, a green garden hose and a couple of garbage cans in the back yard. The house was occupied by defendant and his family. The girl did not give the officers a street name, but they checked the houses on Powhatten Street because it was on a hill. Minutes after examining defendant's house, the officers returned to the area with the girl and Mrs. Abel. The girl directed the police to drive up Powhatten. At the crest of the hill she thought she saw the house she was looking for. A yellow automobile pulled into the driveway of this house, and the driver spoke briefly with the officers. When the victim was taken to the back of the house, she was positive it was the house she had been taken to. She then became very upset and was taken back to the police car. This house was at 2719 Powhatten Street and was defendant's home. The girl saw the driver of the yellow automobile come out of the house and turn and look at her from a distance of 100-150 feet. The man got in his vehicle and drove past the police car. At this point the girl informed the officers that she was positive that he was her assailant. The man was wearing a white jacket when he went into the house and a black jacket when he came out. The victim's identification of defendant came after she identified defendant's house.

Janice and Christine Stevenson related that they lived at 2711 Powhatten Street, two doors away from defendant's home. They testified that while cleaning their garage on February 23, they found a pair of panties, later identified as belonging to the victim, and numerous personal effects which belonged to Mrs. Abel. Mrs. Abel's purse was discovered between the bricks of the Stevenson's back porch. The girls retrieved the items from the garage and turned them over to the police who were at defendant's house.

On appeal, defendant first contends that the evidence at trial did not support the convictions beyond a reasonable doubt. He asserts that circumstances surrounding the attack upon the girl precluded her from accurately identifying her assailant, thereby rendering her testimony unreliable. According to defendant, this unreliability is underscored by various discrepancies between the girl's trial testimony and the statements she made to the police shortly after the attack. Defendant concludes that the inherent unreliability of the testimony of the single eyewitness to the crime and the absence of any direct physical evidence tying defendant to the attack militate against a finding of guilt beyond a reasonable doubt.

In our consideration of this issue on review, we are bound by the decision in *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, in which our supreme court stated:

> "A reviewing court may not substitute its judgment for that of the trier of fact 'on questions involving the weight of the evidence or the credibility of the witnesses [citations], and we will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt.' (*People v. Stringer* (1972), 52 Ill. 2d 564, 568.) Finally, 'where the identification of the accused is at issue, the testimony of one witness is sufficient to convict, even though such testimony is contradicted by the accused under such circumstances as would permit a positive identification to be made.' 52 Ill. 2d 564, 569." 67 Ill. 2d 564, 578, 367 N.E.2d 1313, 1320.

Defendant asserts that the victim was not afforded an adequate opportunity to positively identify the assailant because her only view of his face was of a few seconds duration under adverse weather conditions impeding her power of observation.

According to the evidence, the girl on three occasions viewed a part of the assailant's body. Initially, she was able to see the assailant's lower legs while she was leaning over the wooden rail in the soccer field. From this view she was able to discern that the assailant was a light-complexioned black. The next opportunity to see the attacker occurred after the girl regained consciousness after being choked. As she was pulled to

her feet the blanket no longer covered her eyes, allowing her to view the assailant's face for a few seconds from a distance of no more than "a step away." Finally, she observed the rear profile of the assailant as he walked away from her terminating the encounter. The girl's view of the assailant's face occurred after she had been raped twice. Since her entire ordeal lasted roughly 1½ hours, it is apparent that prior to this view a considerable length of time elapsed during which the girl's eyes had an opportunity to become accustomed to the darkness. The evidence also indicates that a row of street lights was situated approximately 150 feet from the area where the view took place. The adjustment of the girl's eyes to night vision, the distance between the girl and the assailant, and the proximity of the street lights are factors which ameliorate, to some extent, the impact of the darkness and fog. Therefore, under these facts, we cannot say that the girl was afforded no reasonable opportunity to make a positive identification of her assailant.

Defendant contends that the victim's ability to recognize her assailant was further diminished by fear and a semiconscious state of mind induced by the choking which preceded her view of her assailant's face. Relying on *People v. Hughes* (1978), 59 Ill. App. 3d 860, 376 N.E.2d 372, defendant argues that the girl's identification is dubious at best and is insufficient to sustain the convictions.

We do not find *Hughes* controlling in the instant case. There, a robbery victim was walking down a street and heard footsteps approaching her from behind. Before she could turn around, she was assaulted and slammed bodily into a tree, striking her head. She lay unconscious for several minutes before getting to her feet and "staggering" home. In this condition she saw two men running away from a distance of some 500 yards. The men appeared to be wearing clothing similar to that worn by two men the victim had observed 10 minutes earlier while looking out a store window. In reversing defendant's robbery conviction, the *Hughes* court held that the identification of defendant was rendered dubious and uncertain by reason of the following facts: the victim did not see the faces of her attackers, the victim's poor physical condition following the attack, and the distance from which she observed the men running. The instant case is distinguishable in three important respects. First, the victim saw her assailant's face. Second, there is no evidence in the record that the girl's ability to observe was impaired when she saw her assailant after her return to consciousness; therefore, the impaired ability of the victim to observe found in *Hughes* is absent here. Third, the distance between the girl and the assailant could have been no more than a few feet as opposed to 500 yards in *Hughes*.

Defendant asserts that certain discrepancies between the girl's testimony at trial and statements given to the police affect the reliability of her

identification. These discrepancies primarily center around the girl's description of the assailant and the house to which she was taken.

The girl described her assailant to the police as a light-complexioned black male with a medium build, who was between 5 feet 11 inches and 6 feet 1 inch in height. She estimated that he was not over 24 years of age. Defendant was 18 years old at the time of trial. She made an in-court identification of defendant as the person who attacked her. Although in her testimony in court the victim considered defendant to be thin and between 6 feet and 6 feet 2 inches tall, she was unequivocal in her identification of defendant. During cross-examination defense counsel confronted the girl with a brother of defendant. The girl described the brother as being approximately 24 years of age, of medium build and about 6 feet tall. However, the girl was positive that defendant's brother was not her assailant because the complexion of the brother's skin was darker than that of her assailant.

With respect to the house the girl was taken to, she told the police it was a white, two-story house and that a concrete slab, a green garden hose, two garbage cans, and something which resembled a trash burner were located in the back. At trial she stated that the house was light-tan brick in color. In all other respects her description was identical to the one given to the police. In addition, officers had checked the houses in the area of Powhatten Street, including the house at 2711 Powhatten, and did not find any house with both a garden hose and two aluminum trash cans in the back yard. Minor discrepancies in description go toward the weight to be given the evidence. (*People v. Bennett* (1973), 9 Ill. App. 3d 1021, 293 N.E.2d 687; *People v. Henderson* (1976), 36 Ill. App. 3d 355, 344 N.E.2d 239.) We do not find the inconsistencies in the instant case to be sufficient to warrant our disturbing the finding of the trier of fact, who had the opportunity to observe the witness and assess her credibility.

■■ For the reasons stated above, we hold that the evidence introduced at trial supported the convictions beyond a reasonable doubt.

Secondly, defendant contends that he was denied effective assistance of counsel because of the failure of his appointed counsel to call defendant and other witnesses to testify to impeach the victim's identification testimony.

Incompetency of court-appointed counsel is established by a showing of actual incompetence on the part of counsel in carrying out his duties as a trial attorney which results in substantial prejudice to defendant without which the outcome at trial probably would have been different. (*People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203; *People v. Goerger* (1972), 52 Ill. 2d 403, 288 N.E.2d 416; *People v. Thompson* (1978), 66 Ill. App. 3d 141, 383 N.E.2d 690.) The determination of whether to call the accused or a witness other than the accused to the stand is

generally, a matter of trial strategy. (*People v. Brothers* (1932), 347 Ill. 530, 180 N.E. 442; *People v. Elder* (1979), 73 Ill. App. 3d 192, 391 N.E.2d 403.) Further, mistakes in strategy or judgment do not render a trial attorney's representation incompetent. *People v. Atkins* (1980), 81 Ill. App. 3d 661, 402 N.E.2d 383.

■■ ■ At the sentencing hearing, defendant expressed to the court his dissatisfaction with the representation afforded by his trial counsel because neither he nor other witnesses were permitted to testify for the defense. Defendant urged that had he and other unidentified witnesses testified, they would have stated that they overheard the prosecutor advise the girl prior to the preliminary hearing that defendant's house was brown instead of white. Defense counsel explained that his decision not to call defendant to the stand was predicated upon defendant's prior criminal conviction for attempted armed robbery, which could have been used for impeachment purposes. We conclude that defense counsel's decision not to call defendant to testify on his own behalf was a matter of trial strategy and that it did not constitute ineffective assistance of counsel. As to the charge of incompetence based upon trial counsel's failure to call other witnesses in defendant's behalf, we observe that defendant did not indicate to the court who those witnesses were. Further, he did not explain the circumstances under which the prosecutor was overheard conferring with the girl regarding the color of defendant's house. Defendant's statement as to the existence of such evidence and witnesses is speculative in nature and cannot support a claim of incompetency of counsel. *People v. Elder.*

In the final issue on appeal, defendant contends that he was improperly convicted of both aggravated kidnaping and unlawful restraint because both offenses arose out of the same physical act. We agree.

■■ Defendant was charged by information with aggravated kidnaping in violation of section 10—2(a)(5) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 10—2(a)(5)). This section provides:

"Aggravated kidnaping. (a) A kidnaper within the definition of paragraph (a) of Section 10—1 is guilty of the offense of aggravated kidnaping when he:

      ° ° °

           (5) Commits the offense of kidnaping while armed with a dangerous weapon, as defined in Section 33A—1 of the 'Criminal Code of 1961'."

Under section 10—1(a) kidnaping is defined as follows:

"(a) Kidnaping occurs when a person knowingly:

           (1) And secretly confines another against his will ° ° °."

Defendant was also charged by information with unlawful restraint in violation of section 10—3. Unlawful restraint occurs under this section

when a person "knowingly without legal authority detains another." The Committee Comments to section 10—3 treat the offense of unlawful restraint as being synonymous with confinement or detention without legal authority. (Ill. Ann. Stat., ch. 38, par. 10—3, Committee Comments, at 586-87 (Smith—Hurd 1979).) In view of these comments there appears to be no basis upon which to distinguish between the word "detain" in the unlawful restraint statute and the word "confine" in the kidnaping statute. The evidence at trial indicates that the girl was under the assailant's control from the moment he first threatened her in the Abel home until he released her in the soccer field. Since the detainment and confinement of the girl are derived from defendant's continuous control over her, the aggravated kidnaping and unlawful restraint were carved from the same physical act. A defendant cannot be convicted of more than one offense arising from the same physical act. (*People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838.) We therefore reverse the conviction for unlawful restraint.

For the foregoing reasons, we reverse defendant's conviction for unlawful restraint and affirm the remaining convictions.

*Affirmed in part; reversed in part.*

JONES and HARRISON, JJ., concur.