THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DANIEL HINES, Defendant-Appellant.

Fourth District   No. 4—86—0431

Opinion filed February 3, 1988.

Daniel D. Yuhas and Jeffrey D. Foust, both of State Appellate Defender's Office, of Springfield, for appellant.

Edmond H. Rees, State's Attorney, of Carlinville (Kenneth R. Boyle, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

On April 14, 1986, the circuit court of Macoupin County entered judgment on jury verdicts finding defendant Daniel Hines guilty of the following offenses: murder, aggravated criminal sexual assault, criminal sexual assault, aggravated kidnapping, kidnapping, robbery, and unlawful restraint. Then, on June 23, 1986, the court sentenced defendant to a term of natural-life imprisonment for murder. In addition, the defendant received extended-term sentences of 60 years for aggravated criminal sexual assault, 30 years for aggravated kidnapping and 30 years for criminal sexual assault, all three terms to run consecutive to the natural-life sentence for murder. Finally, the court imposed concurrent extended terms of 14 years each for robbery and kidnapping and 6 years for unlawful restraint.

Defendant now appeals and claims the court committed error in: (1) denying his motion for a change of venue; (2) denying several of his challenges for cause for both impaneled and prospective jurors; (3) refusing to excuse one impaneled juror and replace him with an alternate; (4) receiving, at sentencing, evidence of the impact of the dece-

dent's death upon her parents; (5) imposing a natural-life sentence for murder; (6) imposing extended-term sentences for all convictions other than murder; and (7) imposing consecutive sentences for aggravated criminal sexual assault, criminal sexual assault, and aggravated kidnapping. Defendant also contends the convictions for unlawful restraint, kidnapping, aggravated kidnapping, and criminal sexual assault should be vacated either because they (1) are included offenses of another crime for which he was convicted, or (2) arose out of a single transaction in which another crime was committed. We will deal separately with each of these issues under one of three subdivisions in this opinion.

First, however, although no question has been raised as to the sufficiency of the evidence, a brief summary of that evidence is necessary to an understanding of the issues. Most of the evidence of defendant's guilt came from the testimony of Michael Turner and a statement defendant had given to a law enforcement officer.

The evidence revealed the following chain of events. On July 13, 1985, defendant (Hines) and brothers Robert and Michael Turner devised a plan to "pick up" girls by use of a red "police light" on their car; they planned on flashing the light, thereby causing girls driving by in cars to stop. They would then pretend they were police officers and "arrest" the girls. In the late evening, they drove around the rural area of Macoupin County near Wilsonville and stopped along the roadside to wait for some girls to drive past. When decedent, age 16, drove by, they activated their red light, causing her to stop. They then "arrested" her, told her she would have to come with them, and drove her to a cornfield nearby. Robert and defendant then took her six or seven rows into that cornfield. There, Robert forced her to perform oral sex upon him, and then both of the men forced her to have intercourse with them. At some time Robert held his knife to the victim. Later, defendant left the cornfield and joined Michael by the side of the road.

Defendant's statement indicated that, while back at the road waiting for Robert to return, defendant heard the girl scream a few times and gasp for air. However, in his statement, he also asserted that he did not realize the victim had been killed until July 16, 1985, when Robert told him he had to stab through the victim's neck because he could not knock her out. Michael testified that, after defendant came out of the field, he heard a thumping sound and some gurgling noises but did not hear a scream. Michael said Robert then returned to the car carrying his knife and told defendant and him he had not hurt the victim, but it had been hard to knock her out.

The victim's body was found in the cornfield three days after she had been attacked. Evidence indicated she had died from stab wounds near her larynx which had severed her jugular vein. News articles submitted by defendant in his motion for change of venue indicated that the Turner brothers' sister had informed the police how the crime had been committed and where the girl's body and the suspects could be found. The three were then arrested three days after the occurrence.

I

Defendant's first three contentions are all related to the sole question of whether he received a fair trial before an impartial jury.

■ Defendant first contends that, because this case received extensive publicity in the news media, he was unable to get a fair trial from an impartial jury in Macoupin County. As a result, he claims the jury ultimately chosen in his case was either presumptively or actually prejudiced against him. Since the trial court denied his numerous motions for change of venue, he maintains its decision violated both State law and due process.

One case defendant relies on as support for his actual prejudice argument is *Irvin v. Dowd* (1961), 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639. In that case, Irvin was accused of committing six murders in the Evansville, Indiana, area. Due to extensive coverage of the case by the media, the court allowed a change of venue to an adjoining, rural county. However, widespread publicity still prevailed. The news reported details surrounding that defendant's background, prior record, and his confession to the murders as well as various curbstone opinions as to his guilt and proper punishment.

The *voir dire* process in *Irvin* illuminated the strong prejudice which permeated the community. The selection of the jury alone lasted four weeks, and defense counsel exhausted all of his peremptory challenges. Out of 430 veniremen questioned during this process, almost 90% held some opinion as to defendant's guilt. In addition, two-thirds of the jurors who actually served on the panel believed defendant was guilty. Thus, even though each juror stated he could render an impartial decision despite his opinion, the Court accorded little weight to these statements given the pervasive amount of prejudice involved. The Court concluded that, "in light of the circumstances here the finding of impartiality [did] not meet constitutional standards." 366 U.S. at 728, 6 L. Ed. 2d at 759, 81 S. Ct. at 1645.

Although the instant case is somewhat similar to *Irvin*, we find it is more analogous to *Murphy v. Florida* (1975), 421 U.S. 794, 44 L.

Ed. 2d 589, 95 S. Ct. 2031. *Murphy* involved the robbery trial of Jack Roland Murphy, a flamboyant criminal whom the press called "Murph the Surf." Because of his extravagant life-style and prior dealings, the press gave the case a lot of publicity. The media reported extensively on the defendant's prior convictions and the pending charges against him, but the articles which appeared were largely factual in nature. In addition, the majority of news coverage occurred seven months prior to the commencement of the trial.

During jury selection in *Murphy*, 20 of the total 78 veniremen questioned were dismissed as having already prejudged the defendant. The prosecution and defense excused 20 more peremptorily. Of those persons ultimately chosen to serve on the jury, only one juror suggested that his prior knowledge would make him predisposed to convict the defendant.

The *Murphy* Court concluded defendant "failed to show that the setting of the trial was inherently prejudicial or that the jury-selection process of which he complain[ed] permit[ted] an inference of actual prejudice." (421 U.S. at 803, 44 L. Ed. 2d at 597, 95 S. Ct. at 2038.) The surrounding circumstances did not support a finding that defendant did not receive a fair trial.

*People v. Olinger* (1986), 112 Ill. 2d 324, 493 N.E.2d 579, *cert. denied* (1987), 479 U.S. 1101, 94 L. Ed. 2d 180, 107 S. Ct. 1329, also bears some resemblance to the instant case. *Olinger* involved the gruesome murders of three individuals, an occurrence which received widespread publicity throughout Whiteside County, Illinois. Media coverage even included information otherwise inadmissible in a criminal trial. Nevertheless, the court stated that, under the circumstances, it could not conclude defendant failed to receive a fair trial due to the trial court's denial of his motion for a change of venue. Although many of the jurors questioned were familiar with the case, nothing indicated the jurors had knowledge of the prejudicial and inadmissible information.

Since the instant case involved the mysterious disappearance and brutal slaying of a young, innocent girl, it, too, gained immediate media coverage. Other facts which later developed generated further public interest. For instance, the three accused of the crime turned out to be local men who used a police light to stop and abduct the victim. In addition, the sister of two of the accused men told the police of their part in the crime; the news media then reported about the resultant family dissension.

Although some of the news articles relayed emotion-packed stories of the deceased and her family, most, like in *Murphy*, dealt only

with the factual circumstances surrounding the incident and subsequent trials. Some articles even described safety tips for routine traffic stops without mentioning the case itself. Probably the most damaging articles for defendant, although involving information admissible at trial, were the ones which discussed his attempted jailbreak. However, some news articles presented relied on by defendant were in newspapers published outside Macoupin County and not shown to have wide circulation in the county. No news report covered anything as prejudicial or injurious as a televised jailhouse confession (*Rideau v. Louisiana* (1963), 373 U.S. 723, 10 L. Ed. 2d 663, 83 S. Ct. 1417) or the leakage of polygraph test results (*People v. Taylor* (1984), 101 Ill. 2d 377, 462 N.E.2d 478). Moreover, although the media coverage was intense and protracted initially, the publicity had apparently waned somewhat by the time defendant's trial began.

In order to gauge community sentiment over his client's case, defense counsel requested and received approval for a public opinion poll to be conducted. The pollster found that, out of 287 people surveyed, 81% knew of the case by name. More importantly, of those persons who knew of the case, 73% thought the police arrested the right people, and 64% believed those arrested were guilty. Over half of those polled had heard of the case 25 times or more and could name the people charged with the crimes.

Upon commencement of the trial, the court took precautionary measures during *voir dire* by questioning prospective jurors individually and extensively about the depth of their knowledge and possible bias. The parties examined 135 veniremen during the 14-day selection process. Although most had heard of the case, the information they possessed was mostly factual in nature. Only 25% of the prospective jurors were excused for cause because they held a preconceived opinion as to defendant's guilt, quite unlike the situation present in *Irvin*.

Of those jurors ultimately impaneled here, all had heard or read about the case, some in great detail. Three persons chosen to serve as jurors also expressed doubt as to defendant's innocence: (1) Dennis Lahey responded affirmatively after being asked by defense counsel whether he thought defendant was probably guilty of the crime; (2) after reading about the case in the paper and hearing about it from others, juror Allen Johnson just "assumed [defendant was guilty] because he was arrested for it," although he was unsure whether he had "formed an opinion or not"; and (3) finally, juror Joel Warford stated he had formed an opinion as to defendant's guilt prior to being called to serve on jury duty, and his opinion was "that everything—all the evidence pointed to guilt." At the conclusion of their questioning,

however, all impaneled jurors said they could set aside information which they had seen or heard and would decide the case strictly upon the evidence presented in court.

Based on the foregoing, we conclude the trial court's denial of his motions for change of venue did not deny defendant his right to a fair trial before an impartial jury.

■ We next address defendant's related contention that the trial court abused its discretion when it denied several of his challenges for cause for veniremen either later peremptorily challenged or chosen to serve on the jury. Defendant objected to these jurors for numerous reasons: (1) evidence of sympathy towards the victim; (2) equivocal answers to questions posed; (3) extensive knowledge about the case; and (4) predisposed belief as to defendant's guilt. All of the jurors defendant had challenged for cause, though, responded they could presume the defendant not guilty and base their decision on evidence presented in court.

The State initially argues defendant has waived any objections he might have regarding jury impanelment, as he failed to exhaust all of his peremptory challenges. Case law certainly suggests that failure to use all allotted peremptory challenges precludes any complaint on appeal. (*People v. Ford* (1960), 19 Ill. 2d 466, 168 N.E.2d 33, *cert. denied* (1960), 364 U.S. 848, 5 L. Ed. 2d 72, 81 S. Ct. 93; *People v. Feagans* (1983), 118 Ill. App. 3d 991, 455 N.E.2d 871.) Also, such failure by defense counsel to exercise those challenges "tends to belie a claim of unfair prejudice." (*People v. Sanchez* (1986), 115 Ill. 2d 238, 265, 503 N.E.2d 277, 286, *cert. denied* (1987), 483 U.S. ___, 97 L. Ed. 2d 745, 107 S. Ct. 3240.) However, because of the amount of publicity in this case and the number of veniremen apparently influenced by it, defendant had special need to preserve his peremptory challenges. We conclude we should not hold defendant to have waived error in the denial of his challenges for cause for failing to exercise all of his peremptory challenges.

■ At the same time, though, we cannot conclude defendant did not receive a fair trial as a result of the trial court's denial of his challenges for cause. When a heinous offense occurs in such a small community as Macoupin County, widespread publicity is typical. It is not surprising that people learn a lot about the case and eventually form some impression about it from what they have heard or read. That they have done so does not make them biased jurors, however. "It is not required *** that the jurors be totally ignorant of the facts and issues involved. *** It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence pre-

sented in court." *Irvin*, 366 U.S. at 722-23, 6 L. Ed. 2d at 756, 81 S. Ct. at 1642-43.

■ Defendant relies almost exclusively on *Taylor* to support his claim. *Taylor* is distinguishable, though, because there jurors were exposed to highly prejudicial polygraph test results. No similar disclosure happened in the instant case.

The trial judge and parties involved here thoroughly examined all prospective jurors to determine the extent of their knowledge and the potential for bias. As in *Murphy v. Florida* (1975), 421 U.S. 794, 44 L. Ed. 2d 589, 95 S. Ct. 2031, some jurors held a preconception that defendant was guilty. However, like *Murphy*, sufficient indicia of impartiality existed in each instance to support the conclusion that the trial court did not abuse its discretion in denying defendant's challenges for cause.

■ As his final issue concerning the fairness of the trial, defendant asserts the trial court committed reversible error when it refused to grant his motion to excuse a juror and replace him with an alternate.

During the course of the trial, defense counsel received permission to question jurors on whether they had read a certain newspaper article, its headline entitled "[Victim's] Mother: 'I'm Human, I Want Them Dead.' " One juror admitted he saw the article and read about four words of it, despite the court's previous admonishment to refrain from reading any newspaper articles dealing with the case. Although the juror stated it was "getting rougher" to base his decision on what he heard in court, he asserted he would "still be honest as to [his] decision" and "want[ed] to see justice done." Defense counsel then requested that he be removed from the jury, a request the court denied.

Once a trial court realizes members of the jury have been exposed to news articles, it must determine whether they "have been influenced and prejudiced to such an extent that they would not, or could not, be fair and impartial jurors." (*People v. Hryciuk* (1954), 5 Ill. 2d 176, 183, 125 N.E.2d 61, 65.) Such a determination rests within the discretion of the trial court following its examination of all the facts and circumstances. Any abuse of discretion, though, constitutes reversible error. *People v. Murawski* (1946), 394 Ill. 236, 68 N.E.2d 272.

■ This court recently dealt with this same issue in *People v. Talley* (1987), 152 Ill. App. 3d 971, 504 N.E.2d 1318. There, three jurors read either partially or completely an article published during trial; the article had contained information relating to a codefendant's refusal to testify against the accused. During questioning all jurors indicated, among other things, that they could still be fair and impartial.

Although recognizing the potential for prejudice, this court held the trial court had not abused its discretion.

Here, too, we find the trial court did not abuse its discretion in denying defendant's motion to excuse the juror in question. Even though the article seemed to appeal to the reader's emotions, this particular juror only caught a glimpse of it. In addition, he declared the article would not influence his decision in the case. Given the overwhelming evidence of guilt against the defendant under the circumstances, any error committed here would have been harmless.

The three separate issues concerning the fairness of the trial must also be considered together. Notably, the court did not finally rule on the motion for change of venue until the jury was selected. The court took great care in the *voir dire* examination of the jurors and examined each prospective juror out of the presence of others. Considering the conscientious work of the court and the foregoing analysis of the separate issues, we conclude that the trial court did not abuse its discretion in making the decisions involved nor did it deny defendant his right to a fair trial.

## II

■ Defendant next claims several of his convictions must be vacated. He reasons either they (1) are included offenses of another crime for which he was convicted, or (2) arose out of a single transaction in which another crime was committed. Under the rule set forth in *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273, multiple convictions may be entered for multiple offenses unless one offense is an included offense of another, except that only one conviction can be entered for offenses "carved from the same physical act." 66 Ill. 2d at 566, 363 N.E.2d at 844.

Section 2—9 of the Criminal Code of 1961 (Criminal Code) (Ill. Rev. Stat. 1985, ch. 38, par. 2—9) defines "included offense" as:

"[a]n offense which
(a) Is established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged."

The usual method of determining whether one offense is an included offense of another is by comparison of either the statutory definitions of the offenses or by comparison of the manner in which they are set forth in the charges. *People v. Mays* (1982), 91 Ill. 2d 251, 437 N.E.2d 633; see also *People v. Dace* (1984), 104 Ill. 2d 96, 470 N.E.2d 993.

■ First, defendant maintains his conviction for kidnapping must

be vacated because that offense is an included offense of aggravated kidnapping. Section 10—2(a) of the Criminal Code (Ill. Rev. Stat. 1985, ch. 38, par. 10—2(a)) describes aggravated kidnapping as certain conduct committed by a "kidnapper" within the meaning of section 10—1(a) of the Criminal Code (Ill. Rev. Stat. 1985, ch. 38, par. 10—1(a)). Section 10—1(a) contains three definitions of kidnapping. Both kidnapping and aggravated kidnapping were charged in various ways in this case, but clearly only one kidnapping occurred. Thus, the offense of kidnapping of the victim, however defined, was an included offense of any aggravated kidnapping of the victim. Accordingly, the conviction for kidnapping must be vacated.

■ Defendant's further assertion that his unlawful restraint conviction must be vacated because unlawful restraint is an included offense of aggravated kidnapping is a more complicated question.

A person unlawfully restrains another "when he knowingly without legal authority detains another" (Ill. Rev. Stat. 1985, ch. 38, par. 10—3). The types of kidnapping upon which the aggravated kidnapping charges were based derived from section 10—1(a)(1) of the Criminal Code (Ill. Rev. Stat. 1985, ch. 38, par. 10—1(a)(1)), which involves the secret confinement of another against his will, and section 10—1(a)(3) of the Criminal Code (Ill. Rev. Stat. 1985, ch. 38, par. 10—1(a)(3)), which consists of inducing another by deceit or enticement from one place to another with the intent of secretly confining that person against his will. As detainment and confinement are synonymous (*People v. Tate* (1981), 94 Ill. App. 3d 192, 418 N.E.2d 1048), defendant's conviction for unlawful restraint was, by definition, an included offense of any aggravated kidnapping based on a section 10—1(a)(1)-type of kidnapping.

The offense of unlawful restraint has also been held to be an included offense of a section 10—1(a)(3) kidnapping, which involves inducement by deceit or enticement to go from one place to another with an intent to secretly confine. (*People v. Kittle* (1986), 140 Ill. App. 3d 951, 489 N.E.2d 481.) We have some concern with such a decision because that type of kidnapping would be complete upon the inducement with the intent to confine without confinement or detention actually taking place. However, we need not decide whether unlawful restraint is an included offense of such a kidnapping. Here, every charge of aggravated kidnapping included one of the following aggravating factors as set forth in section 10—2(a) of the Criminal Code (Ill. Rev. Stat. 1985, ch. 38, par. 10—2(a)): (1) the infliction of great bodily harm; (2) the commission of the felony, criminal sexual assault, upon the victim; and (3) the commission of the felony, aggravated

criminal sexual assault, upon the victim. Commission of these acts could not take place merely upon inducement but would also require some detaining or confining. We hold, thus, as charged here, the offense of unlawful restraint was an included offense of aggravated kidnapping. The conviction for unlawful restraint must also be vacated.

We next briefly examine defendant's claim that the criminal sexual assault conviction must be vacated because it was for an offense included within the offense for which the aggravated criminal sexual assault conviction was obtained. By definition, criminal sexual assault is an included offense of aggravated criminal sexual assault because criminal sexual assault is the predicate offense upon which the aggravating factors of section 12—14(a) of the Criminal Code (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)) are added to establish the offense of aggravated criminal sexual assault. Here, however, more than one sexual assault was perpetrated on the victim. The jury could have found defendant guilty of one sexual assault based on the intercourse he had with the victim and, by accountability, found him guilty for the sexual acts which Robert forced on her. Accordingly, both the aggravated sexual assault conviction and the sexual assault conviction must stand.

Finally, defendant asserts the convictions for kidnapping and aggravated kidnapping must be reversed because they arose out of a single transaction in which the crime of aggravated criminal sexual assault occurred. We have already vacated the kidnapping conviction and, thus, deal only with the aggravated kidnapping conviction here. The basis of defendant's contention is this court's decision in *People v. Sims* (1974), 20 Ill. App. 3d 1068, 313 N.E.2d 663. Any precedent of that decision helpful to defendant was overruled by the decision of the supreme court in *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, which limited multiple convictions only when a single act or an included offense was involved. The *King* court held that, otherwise, multiple convictions could stand. Here, the aggravated kidnapping did not arise out of the same act as the aggravated criminal sexual assault, and neither offense was an included offense of the other. Accordingly, the conviction for aggravated kidnapping must stand.

In summary, in regard to this unit, we vacate the convictions for kidnapping and unlawful restraint and affirm the convictions for criminal sexual assault and aggravated kidnapping.

## III

In this final section we consider the sentencing portion of the case, passing first upon defendant's contention that the court should

not have received evidence of the impact of the victim's death upon her parents.

Section 6 of the Bill of Rights for Victims and Witnesses of Violent Crimes Act (Act) (Ill. Rev. Stat. 1985, ch. 38, par. 1406) grants to victims of violent crimes the right to be present at sentencing and to address the court in regard to the impact of the crime upon the victim, except in cases, unlike here, where the defense and prosecution have agreed to the sentence. Section 3(a)(3) of the Act (Ill. Rev. Stat. 1985, ch. 38, par. 1403(a)(3)) includes within the definition of the word "victim," the "parent," or "sibling" of a person killed as a result of a violent crime. Similar authority is given to a "victim of a violent crime" by the terms of section 5—4—1(a)(6) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—4—1(a)). Acting pursuant to this legislation, the court permitted the parents of the victim to read, at sentencing, from such a report describing the devastation to the family as a result of the death of their daughter. In one part of the statement, the parents expressed an opinion that the death penalty would have been the appropriate punishment for defendant.

Relying primarily upon decisions in *Booth v. Maryland* (1987), 482 U.S. ____, 96 L. Ed. 2d 440, 107 S. Ct. 2529, and *People v. Hope* (1986), 116 Ill. 2d 265, 508 N.E.2d 202, defendant maintains that permitting the parents to present the impact statement was plain error which violated his rights under the eighth amendment and the due process clause. In *Booth* a State trial court had permitted testimony by the children of two murder victims as to the murders' impact on the family of the victims to be presented to the jury at the stage of the trial where the jury passed upon the question as to whether the death penalty should be imposed. By a vote of five to four, the United States Supreme Court held that the imposition of the death penalty after such evidence had been received by the jury violated the eighth amendment rights of the defendant.

In *Hope* the trial court had allowed evidence by the deceased's family to be introduced to the jury at the guilt phase of a trial; defendant was convicted of murder, and the death penalty was imposed. The Illinois Supreme Court concluded that introduction of such evidence in a manner that the jury would believe it to be significant or argument to the jury which dwells upon that evidence or seeks to relate that evidence to the defendant's punishment was prejudicial error. The court deemed this to be especially true when the death sentence was ultimately imposed.

Here, the impact evidence was presented to the court at sentenc-

ing, where the imposition of the death penalty was not in issue. Defendant contends that the *Booth* opinion, by referring to the decision in *People v. Bernette* (1964), 30 Ill. 2d 359, 197 N.E.2d 436, implies that evidence concerning the impact of a murder upon the victim's family at sentencing is also constitutionally impermissible even in cases where imposition of the death penalty is not in issue. In *Bernette* evidence as to the circumstances in which the murder victim's family had been left was submitted to the jury at trial. The defendant was convicted and sentenced to death. In reversing and remanding for a new trial, the court stated that such evidence "has no relationship to the guilt or innocence of the accused or the punishment to be inflicted upon him, but serves ordinarily only to prejudice him in the eyes of the jury." (30 Ill. 2d at 371, 197 N.E.2d at 443.) The *Booth* opinion makes clear that the introduction of victim-impact evidence is constitutionally impermissible only where imposition of the death penalty is in issue. All Illinois cases cited by defendant on the subject also concern submission of victim-impact evidence to the jury in capital cases.

Defendant's eighth amendment rights were not violated by the victim-impact evidence presented here.

■■ Defendant also asserts that the legislation permitting use of victim-impact information at sentencing violates the separation of powers doctrine because determining the weight to be given to evidence is inherently purely a judicial function. He cites *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541. There the court held invalid legislation which determined the standards to be applied by appellate courts in reviewing sentences in criminal cases. The court there used broad language, but the thrust of the opinion was that the legislation had violated the edict of the judicial article of the Illinois Constitution of 1970 (Ill. Const. 1970, art. VI, §1) which gave the supreme court exclusive power to regulate appellate practice. The issue here is the admissibility of evidence, not the weight to be given to it. Examples of valid legislation concerning the admissibility of evidence are legion. The legislation permitting introduction of the evidence here did not violate the separation of powers doctrine.

The State maintains that the issue of the admissibility of the impact evidence was waived by tardiness in raising the issue. We need not decide that question because the introduction of the evidence was proper.

■■ Turning to the propriety of the nature of the sentences imposed, defendant maintains the court abused its discretion in imposing a natural-life sentence for murder. He bases his contention on an as-

sertion that the court misinterpreted the evidence.

Section 5—8—1(a)(1)(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(b)) allows a court to sentence a defendant convicted of first-degree murder to a term of natural life if it "finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." The trial judge concluded such behavior existed here and apparently based his decision on the following findings: (1) the murder committed by Robert Turner was particularly brutal, and Hines was accountable for such conduct; and (2) defendant failed to help the dying girl and, in fact, left her there to die. Defendant argues these findings were erroneous and unsupported by the evidence, as he neither endorsed Robert's conduct nor realized the murder was taking place.

Some evidence indicated that defendant believed Robert Turner only knocked the girl out and had not fatally stabbed her in the throat. However, other facts strongly suggested defendant was cognizant of what was taking place in the cornfield after he left. The court could have determined defendant knew Robert had a knife which he used to threaten the victim during the sexual assaults. Thus, the court could have concluded that when defendant heard the victim scream, gurgle, and gasp for air, defendant knew the victim's throat had been slashed. Michael testified that Robert was carrying a knife when he returned to the car. Thus, the court could properly have found defendant knowingly left a dying or very severely injured victim in the field.

Furthermore, under this court's decision in *People v. Tibbs* (1981), 103 Ill. App. 3d 73, 430 N.E.2d 681, the court could have held defendant responsible by accountability for Robert's obviously "exceptionally brutal or heinous behavior indicative of wanton cruelty."

In *Tibbs*, this court held a defendant to be subject to an extended-term sentence under the same language in section 1005—5—3.2(b)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)(2)) because he was accountable for the exceptionally brutal and heinous conduct of another. This court stated that it is "the nature of the act and not the identity of the actor [which] permits the imposition of the enhanced penalty." (*Tibbs*, 103 Ill. App. 3d at 77, 430 N.E.2d at 683.) We see no reason why the same rule of vicarious liability applied to section 5—5—3.2(b)(2) should not be applied to section 5—8—1(a)(1)(b) (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(b)). Accordingly, the sentence of natural-life imprisonment for murder must stand.

■ Defendant next contends the trial court committed error in sentencing him to extended terms for the offenses of unlawful re-

straint, robbery, kidnapping, aggravated kidnapping, criminal sexual assault and aggravated criminal sexual assault. The State concedes the imposition of extended terms for all of the aforementioned crimes except aggravated criminal sexual assault was error. In addition, we have already vacated the convictions for unlawful restraint and kidnapping. Thus, we will only address defendant's contention as it relates to aggravated criminal sexual assault.

Section 5—8—2(a) of the Unified Code of Corrections states in pertinent part:

> "A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2(a).)

Defendant maintains all extended terms imposed, including the one for aggravated criminal sexual assault, must be vacated because none of them are in the same class as murder. Murder is the most serious offense for which he was convicted.

*People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569, generally supports defendant's claim. There, two defendants received extended-term sentences on their convictions for armed robbery and kidnapping. However, those offenses were not located in the same class as murder, the most serious offense for which they were convicted. The supreme court concluded the extended terms were improper. It went on to state that, when multiple convictions for offenses located in different classes are involved, a court may only impose an extended-term sentence for that conviction within the most serious class.

The supreme court further defined *Jordan* in *People v. Neal* (1985), 111 Ill. 2d 180, 489 N.E.2d 845, *cert. denied* (1986), 476 U.S. 1165, 90 L. Ed. 2d 733, 106 S. Ct. 2292. There, the trial court sentenced the defendant to death for his murder conviction and then imposed an extended-term sentence for armed robbery, even though the armed robbery charge fell in a class less serious than murder.

The supreme court upheld the extended-term sentence, however. The statutory provision for extended terms noted earlier refers the reader to section 5—8—1 of the Unified Code of Corrections (Code). (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1.) That section mainly sets forth terms of imprisonment. Since provisions for capital sentencing are located elsewhere in the Code, the court in *Neal* concluded extended-term sentencing would not be applicable to a death sentence.

Therefore, the court held the trial court properly imposed an extended-term sentence for armed robbery, as it was located in "the class of the most serious offense of which the defendant was convicted *when defendant was sentenced to a term of years.*" (Emphasis added.) *Neal*, 111 Ill. 2d at 204-05, 489 N.E.2d at 855.

The State cites *People v. Young* (1987), 152 Ill. App. 3d 361, 504 N.E.2d 115, to support its argument that the trial court properly imposed an extended-term sentence for aggravated criminal sexual assault. There, like in the instant case, the defendant received a term of natural-life imprisonment for his murder conviction and an extended-term sentence for his lesser Class X felony conviction. Relying on *Neal*, the First District Appellate Court upheld the imposition of the extended-term sentence. It reasoned that a natural-life sentence was not a term of years but "by its very nature [was] a sentence of undetermined length." 152 Ill. App. 3d at 366, 504 N.E.2d at 118.

Although the authority to impose a natural-life sentence is located in section 5—8—1(a)(1)(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(b)), the statutory provision to which the extended-term section refers (*Neal*, 111 Ill. 2d 180, 489 N.E.2d 845), we agree with the result reached in *Young*. It would be approaching absurdity to conclude an extended-term sentence is available for natural-life imprisonment where there is no possibility for release. Hence, since the court here chose to impose a natural-life sentence for murder, it committed no error in sentencing defendant to an extended term for aggravated criminal sexual assault, the most serious offense for which he was convicted and sentenced for a term of years. The remaining extended-term sentences imposed must be reduced as follows: (1) aggravated kidnapping and criminal sexual assault, to terms of 15 years each; and (2) robbery to a term of seven years.

■ Defendant next contends the trial court erred in ordering the sentences for aggravated criminal sexual assault, criminal sexual assault and aggravated kidnapping to run consecutively to the natural-life imprisonment term for murder. He maintains the court's decision in imposing consecutive sentences violated section 5—8—4 of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4) in: (1) it was not necessary in order to protect the public from further criminal conduct by defendant; and (2) the aggregate of the consecutive sentences exceeded the sum of the maximum extended terms for murder and aggravated criminal sexual assault, the two most serious felonies for which defendant was convicted.

Regarding the first alleged statutory violation, defendant argues

no useful purpose will be served for the public's protection by the imposition of consecutive sentences. This is because he has already received a natural-life sentence without the possibility of release for his murder conviction and has little chance for release in the future.

The court here was of the opinion, as required by statute, that consecutive sentences were, in fact, necessary in order to protect the public from the defendant. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(b).) Nowhere does the statute prohibit the court from imposing sentences consecutive to a term of natural-life imprisonment. Numerous cases have allowed it. (*People v. Bush* (1981), 103 Ill. App. 3d 5, 430 N.E.2d 514; *People v. Wilson* (1985), 138 Ill. App. 3d 513, 485 N.E.2d 1264.) In addition, consecutive sentencing may well be beneficial even under these circumstances should defendant's life sentence be subsequently modified, commuted or reduced. *People v. Epps* (1986), 143 Ill. App. 3d 636, 493 N.E.2d 378.

Regarding the second alleged statutory violation, defendant contends the trial court violated the prohibition against excessive consecutive sentencing set forth in section 5—8—4(c)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(c)(2)), which states in part:

> "[T]he aggregate of consecutive sentences shall not exceed the sum of the maximum terms authorized under Section 5—8—2 for the 2 most serious felonies involved."

The State contends no violation has been committed, especially because it conceded that the extended-term sentences for aggravated kidnapping and criminal sexual assault should be reduced to the maximum regular-term sentences for those offenses. The State maintains that after those reductions are made, the computation is as follows. The two most serious felonies involved are murder and aggravated criminal sexual assault. The maximum terms for these offenses under section 5—8—2 are 80 and 60 years, respectively. Thus, the total maximum term for the two offenses is 140 years. The offenses for which the terms are ordered to run consecutively are aggravated criminal sexual assault, aggravated kidnapping, and sexual assault. The sentences of imprisonment imposed for these offenses were 60, 15, and 15 years, respectively. The aggregate of those sentences was 90 years, which is 50 years less than the 140 years aggregate which was permissible under section 5—8—4(c)(2). Thus, the aggregate of the consecutive sentences falls within the guidelines of section 5—8—4(c)(2).

The foregoing statutory provisions concerning consecutive sentences do not make clear whether the base sentence, here natural-life imprisonment, is included in the calculations determining the permissible

aggregate of such sentences. Notably a sentence for natural life is not one of the sentences authorized by section 5—8—2 of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2). Although computations by trial courts in other cases have contained all sentences involved in consecutive sentencing, none of those cases dealt with the natural-life imprisonment term we have before us now. *People v. Gholston* (1984), 124 Ill. App. 3d 873, 464 N.E.2d 1179; *People v. Woods* (1985), 131 Ill. App. 3d 51, 475 N.E.2d 589.

Due to the unusual nature of a natural-life sentence, it is of no significance whether this base term was included in the calculations. As long as the natural-life imprisonment sentence continues, the consecutive sentences involved will never be physically served by the defendant. Should the sentence of life ever be vacated or modified, the defendant will still serve his consecutive sentences (as adjusted by the applicable governing body). Hence, we conclude the trial court did not violate the statutory prohibition against excessive consecutive sentencing.

For the reasons stated: (1) we affirm the convictions of defendant for the offenses of murder, aggravated criminal sexual assault, criminal sexual assault, aggravated kidnapping, and robbery; (2) we affirm the natural-life sentence imposed for murder and the sentence imposed for aggravated criminal sexual assault; (3) we reduce the sentences imposed for criminal sexual assault and aggravated kidnapping each to terms of imprisonment of 15 years and that for robbery to a term of seven years; (4) we affirm the portion of the judgment requiring that certain of the sentences be served consecutively to the sentence for murder and consecutively to each other; and (5) we reverse the convictions and sentences for the offenses of kidnapping and unlawful restraint.

Affirmed in part; reversed in part and specified sentences reduced.

KNECHT and SPITZ, JJ., concur.