THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LINDA LEE KLISNICK, Defendant-Appellant.

First District (1st Division)   No. 78-31

Opinion filed May 29, 1979.

Ralph Ruebner and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Paul C. Gridelli, and Thomas Brucker, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Linda Lee Klisnick, was indicted for the offenses of aggravated battery, attempt murder and arson. (Ill. Rev. Stat. 1975, ch. 38, pars. 12—4(a), 12—4(b)(1), 8—4, 9—1 and 20—1.) After a bench trial, the circuit court of Cook County found defendant guilty of arson, but not guilty of the other charges. The court entered judgment on the findings and sentenced defendant to a term of incarceration in the Department of Corrections of not less than one year nor more than one year and one day.

Defendant appeals her conviction, contending that she was not proved guilty beyond a reasonable doubt and the trial court erred in admitting testimony concerning the threatening contents of a note when it was not produced at trial.

Ron Lira, the complaining witness, testified that on March 16, 1975, at about 6 p.m., he was at his brother's apartment in Chicago, Illinois. Several other people were also present, including his brother Roy Lira, Dave Tibor, Steven Rosenquist, the defendant, Dawn Soderburg and Cheryl.

Lira testified that defendant requested him to cash $20 worth of food stamps for her. He agreed, placed the stamps on the kitchen table and went into the bathroom. When he returned from the bathroom, the food stamps were gone. Defendant accused Lira of "ripping her off" and an argument ensued.

Complainant left with his brother-in-law Dave Tibor and went to his father-in-law's home. Lira further testified that he went out that evening with his in-laws and returned to their home around midnight. Upon their return, Lira received a note, found by his brother-in-law. Lira described the note as written on yellow paper, approximately four inches by five inches, with a jagged edge. He could not recall its contents verbatim, but testified that it was to the effect:

> "Ron, you burned me once. You are not going·to burn me again. * * * I am going to burn you and your property, personal property."

Lira testified that the note also contained three signatures in the following order: Linda, Dawn, Cheryl. Lira went home and threw the note away.

At home, Lira's wife and children retired for the night. Lira went into the dining room, sat on the couch and listened to the stereo. As Lira was listening to the stereo, he heard an object come through the window. At this point he ran out the front door of his first-floor apartment, jumped over a railing and ran into a gangway. He then observed defendant and Dawn Soderburg about fifteen feet away from him, standing towards his dining room window. Lira testified that he observed a glass-type object with a flame at the end in defendant's hand. Her arm was in motion and the object left her hand and entered through Lira's dining room window.

After throwing the object, the two girls ran towards a car and Lira gave chase. He observed defendant enter the driver's side and Dawn the passenger's side of a 1965-1967 blue Oldsmobile. He also observed the back of the head of a third person in the back seat of the vehicle.

Lira then noticed that his dining room was on fire and ran back into his home. He evacuated his wife and son and returned for his daughter. At that time, he heard a "whoosh" sound and was knocked unconscious. Lira next remembered waking up in a hospital.

Lira also testified as to the extent of the injuries suffered by his daughter and himself. He identified various photographs of his apartment depicting extensive fire damage. Finally, Lira testified that he had previously been convicted of theft.

On cross-examination, Lira testified that on the day of the fire he made a statement to Officer McQuinn that he had been lying on the couch, half asleep, when he heard a crash and ran out to investigate. At that time he did not tell the officer about seeing any persons in the

gangway. About 10 days later, Lira gave another statement to McQuinn where he mentioned having seen someone in the gangway.

Prior to the fire a candle had been lit, but Lira testified his wife had put it out before going to bed. Lira did acknowledge that in his first statement to Officer McQuinn he said that he originally thought the cause of the fire was a candle, but realized that was impossible due to the extent of the fire.

On redirect examination, Lira explained that the first statements given to Officer McQuinn occurred while he was in pain and sedated in the hospital emergency room and intensive care areas. He was sedated for about nine days.

George Tibor testified that during the evening hours of March 16, 1975, he went to dinner and a show, accompanied by his wife, son David, daughter and son-in-law Ron Lira. They returned home at about 12 p.m. Shortly thereafter defendant, Dawn Soderburg and Cheryl came to the door. Defendant asked Tibor whether Ron Lira was inside and Tibor responded negatively. Defendant explained she was angry and wanted to see Lira because he had taken some money. She also mentioned seeing Lira's truck parked across the street, but Tibor explained it was inoperable.

The three girls returned to the car, a dark blue 1965 Oldsmobile, and drove about one-half block away. They stopped the car and backed up to Lira's truck. The witness next observed Dawn get out of the car and place a note under the windshield wiper of the truck. Tibor instructed his son to retrieve the note. According to Tibor, the note was a yellow piece of paper about four by six inches with a jagged top edge. Although he could not recall its exact contents, Tibor testified as to the substance of the note:

> "Ron, I want my $20 that you burned me for. You burned me once. More than once, and you are not getting away with it. If you don't give me the—pay me the $20 by Sunday, I am going to burn you and your possessions."

The note had three names on the bottom, in the following order: Linda, Dawn and Cheryl. After the fire in Lira's apartment, Tibor recovered the note from Lira's kitchen garbage can. He gave the note to Officers McQuinn and Schuler.

Steven Rosenquist testified for the State that he was present in complainant's brother's apartment on March 16, 1975, between 5 and 7 p.m. He heard a discussion between complainant and defendant concerning food stamps, but admitted not paying too much attention at that time. Rosenquist testified that Lira left the apartment. At about 10:30 to 11 p.m., defendant, Linda, Dawn, Cheryl, Joe, Junior and Rosenquist left in defendant's car to find Lira. They went to the Tibor residence and noticed Lira's truck parked nearby. The three girls went to see if Lira was there, had a discussion with Mr. Tibor and returned to the car. Rosenquist

testified that defendant was mad about something. As the car started to pull away, defendant said: "That stupid Lira ripped me off like that, burned me like that." Junior suggested that she write a note to Lira.

At this time they backed the car up and defendant started writing on a yellow piece of paper. She then handed the note to Dawn, who signed something and handed it to Cheryl, who also wrote something on the note. Rosenquist did not see the contents of the note but described the paper as yellow, 8 by 11 inches and ripped on the side. At defendant's request, Dawn placed the note on Lira's truck and they returned to the apartment.

The three girls again left and returned at about 12:30 p.m. At this time Rosenquist, Junior, Harry and George were also in the apartment. Rosenquist testified that he heard a conversation concerning how to make a Molotov (cocktail) but couldn't recall who participated in the conversation.

On cross-examination, Rosenquist testified that he gave a statement to police officers and said Lira agreed to exchange money for food stamps with Cheryl. Additionally, in this statement he said Dawn wrote the note. On redirect-examination, he explained that all three girls wrote something on the note.

Investigator Nicholas Schuler testified that on March 17, 1975, he talked with George Tibor, Sr., pursuant to his investigation of the Lira fire. At this point Schuler received a handwritten note on yellow paper that was torn on two sides and approximately four by five inches. Schuler testified the note said substantially that: "You burned me once, and if I don't get my $20 back I will fuck you and your house." Three names followed: Linda, Dawn and Cheryl. Officer Schuler placed the note in a "street file" at headquarters. He remembered seeing it the day of the preliminary hearing and replacing it in the file. At the time of trial, Schuler did not know what had happened to the note. No copies were made of the note and no handwriting samples were taken from defendant.

Officer John Bickler of the Chicago Police Department Bomb and Arson Unit next testified. His duties consisted of determining the cause and origin of fires. Bickler testified that the fire in the Lira residence originated in the dining room. The electrical outlets and wires were in normal condition and, according to Bickler, electrical malfunction was not the cause of the fire.

Officer Bickler next identified various pictures of the damaged apartment. Bickler concluded that damage in the living room was strictly due to heat from the adjacent dining room where the fire originated. The fire was concentrated in the center of the room in front of a small service bar. At this location there was also evidence of a "hot spot" (heaviest burning area) extending approximately six to seven feet with a width of about two feet.

A State exhibit was identified as depicting shelves in the dining room. Bickler testified that there was deep burning into the wood. The majority of the heavy burning was on the end of the shelves and on the top. There was very little burning beneath the shelves. In Bickler's opinion, this indicated that an accelerant was used in the fire. Bickler theorized that an accelerant was either poured or thrown on that shelf and then landed on the floor. An alternative possibility was that two bottles were used, resulting in similar burning patterns on the shelf and floor. Bickler further testified that a candle, visible in the picture, could not have caused the type of burning and heat intensity that resulted in Lira's apartment.

Laboratory analysis of samples of the wood, carpeting and padding failed to reveal the presence of hydrocarbons. Bickler explained the absence of hydrocarbons could be due to the amount of water used to extinguish the fire, the time lapse between the time of the fire and when samples were taken, and total burning and consumption of any accelerant because of the intense heat. Bickler discovered a substantial amount of broken glass and bottles in the dining area. He stated that since there was so much broken glass because of fallen bottles from Lira's bar, there was no way of determining if any of the broken glass once contained the accelerant.

Finally, it was Bickler's opinion that the fire was caused by an accelerant and that it originated in the dining room on the shelves and in the middle of the dining room floor.

On cross-examination, Bickler admitted that if cleaning fluid or liquor had been spilled on the rug it could have burned. He also testified that if a lit bottle or container with a flammable hydrocarbon was thrown into the dining room, there would be an immediate burning or explosion upon impact. Bickler also testified as to a conversation with Lira about two days after the fire, while Lira was in the hospital. According to Bickler, Lira stated that at the time of the fire he was lying on the couch in the dining room. He had been watching television and had fallen asleep. Lira was awakened by a "whoosh" noise and the breaking of glass. Upon awakening, he saw fire on the floor and shelves and ran out of the house. Lira also made some vague comments that he thought he saw some people in or around the building.

On redirect examination, Bickler explained that Lira was in pain during their conversation and his answers were very vague.

Roy Lira, Jr. (nicknamed Junior), complainant's brother, next testified that on March 16, 1975, defendant, Dawn and Cheryl were at his apartment. They had food stamps which they wanted Ron Lira to trade for money. Complainant left his brother's apartment and did not return. Junior testified corroborating the trip to complainant's father-in-law's house. He suggested the girls leave a note on the truck.

At this point, defendant ripped a piece of paper from her purse, signed her name and Dawn and Cheryl also signed it. Dawn put the note on the truck. Junior described the note as yellow paper about 8 by 8 inches. He did not read the note.

After placing the note on Lira's truck, the girls dropped Junior off at his apartment, but returned later that night. Junior heard defendant tell "Harry" that "Ron was going to burn tonight." Junior and Harry suggested that they "just kick his ass."

On cross-examination, Junior admitted giving a statement to the police on March 19, 1975. At that time he stated that the food stamps were Cheryl's. He also admitted that in his statement he said Cheryl had threatened to burn complainant.

Harry Czerwinski was the final witness for the State. He testified that on the night of the incident he was at Junior's apartment and engaged in a conversation with defendant. According to Czerwinski, defendant said she "had been burned by Ron Lira and that she was going to burn him tonight." She asked whether lighter fluid or gasoline was better for a Molotov cocktail. The witness responded that "she was crazy and that she ought to give Ron a good ass kicking, that is what he deserves."

Defendant testified that she saw complainant at Junior's apartment and asked him if he could cash food stamps for Cheryl. Cheryl gave complainant the food stamps and he went into the kitchen with them, but never returned. In searching for complainant, the three girls went to Lira's father-in-law's home. Cheryl told Lira's father-in-law that Ronnie burned her for $20 in food stamps and that she wanted the money.

Defendant further testified that Dawn wrote the note, signed all three names and placed the note on Lira's truck. Defendant described the note's contents as: "Something about you burned me once and I don't like to get burned and I will get even." The girls returned to Junior's home and dropped him off. They returned a few minutes later and talked to Junior. Defendant denied seeing or conversing with Harry Czerwinski and stated he said nothing about a Molotov cocktail. Defendant denied being in the gangway to Lira's apartment and denied throwing a bottle through Lira's window. She further stated she did not start a fire at his apartment.

On cross-examination, defendant admitted giving a statement to the police on March 17, 1975, saying that all three girls gave the food stamps to Lira. She further indicated in the statement that she was mad at Lira, but denied being mad when cross-examined.

Defendant contends she was not proved guilty of arson beyond a reasonable doubt. Specifically, she argues that complainant's testimony was so thoroughly impeached and contradicted as to invalidate her conviction.

The State maintains that complainant's testimony was clear, convincing

and consistent and substantially corroborated by witnesses who were present at various stages of events leading up to the arson.

Complainant, Ron Lira, testified that he had a conversation with defendant at his brother's apartment. She requested Lira to cash $20 worth of food stamps and he agreed. Complainant claimed he placed the stamps on a table while he went to the bathroom. When he returned, the stamps were gone and defendant accused him of "ripping her off."

After an argument with defendant, Lira left the apartment and went out that night with his in-laws. Upon returning to his father-in-law's home, Lira received a note written on a yellow, jagged piece of paper, about four by five inches in size. He could not recall the exact language used in the note, but said it was to the effect: "Ron, you burned me once. You are not going to burn me again * * *. I am going to burn you and your property, personal property." The note was signed: Linda, Dawn, Cheryl.

Lira further testified that when he returned to his home, he sat on a couch in the dining room and listened to the stereo. He subsequently heard an object come through the window and ran out the front door, jumped over a railing and entered the gangway. There he observed defendant and Dawn standing in the gangway. Lira stated that defendant held a glass object with a flame at the end. He saw her throw the object through his dining room window. Both girls then fled to defendant's car.

At this point Lira noticed his dining room was on fire, so he returned to evacuate his family. Once inside the apartment, Lira heard a "whoosh" sound and was rendered unconscious.

On cross-examination, Lira was questioned concerning answers he had given in police statements a day or two after the fire. In these statements Lira did not tell the police about seeing any persons in the gangway. About 10 days later, Lira gave a written statement to Officer McQuinn in which he mentioned having seen people in the gangway. However, he did not mention seeing a bottle with a flaming wick in defendant's hand. Officer Bickler testified that when he interviewed Lira about two days after the fire, Lira made some vague comment as to seeing people near the building.

While Lira's earliest statements serve to impeach his trial testimony, we note that they were taken within two days of the fire. At this time Lira was either in the emergency room or the intensive care unit of the hospital. Moreover, he was in pain and under sedation. When Lira came out of sedation about nine or 10 days later, he mentioned seeing people near the building. His response to Bickler's questioning two days after the fire also evidenced some remembrance of people near the house.

■■ These factors affect the weight to be given Lira's testimony by the trier of fact. However, the traumatic circumstances of Lira's hospital condition after the fire mitigate the impeachment value of these early police

statements. It is the function of the trier of fact to determine the credibility of witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.) Under the circumstances of this case, Lira was not so substantially impeached as to raise a reasonable doubt of defendant's guilt. Compare *People v. Morgan* (1977), 69 Ill. 2d 200, 370 N.E.2d 1063.

Defendant alleges further inconsistencies between Lira's testimony and early police statements. The record indicates that, considering his medical condition, these discrepancies are minor and do not detract from the reasonableness of complainant's story as a whole. See *People v. Brown* (1975), 32 Ill. App. 3d 182, 336 N.E.2d 523.

■■ Defendant finally contends that Lira's admission to a prior theft conviction and to agreeing to illegally exchange money for food stamps materially detracts from the reasonableness of his testimony. Again, these are merely factors bearing upon credibility. Moreover, the adequacy of proof to support a conviction depends on the individual facts of each case. (*People v. Johnson* (1968), 93 Ill.App. 2d 184, 236 N.E.2d 388.) Much of Lira's testimony was substantially corroborated by other witnesses who were present at various stages of events leading up to the arson.

Rosenquist corroborated the discussion between Lira and defendant concerning the food stamps. He further testified as to defendant's anger. Tibor, Rosenquist and Junior confirmed that the three girls were looking for Lira.

Witnesses also corroborated Lira's testimony that a threatening note written by defendant existed. As the note was not produced at trial, no witness remembered its exact contents. Yet, Tibor and Schuler testified to the substance of a threat to do damage to Lira and his property. Rosenquist and Junior Lira testified that defendant wrote the note. Rosenquist also testified he overheard a conversation about how to make Molotov cocktails. Czerwinski testified as to threats against Lira by defendant and that she asked him about Molotov cocktails.

■■ In short, Officer Bickler's testimony was sufficiently convincing to establish the fire was caused by an accelerant rather than accident. (See *People v. Smith* (1976), 44 Ill. App. 3d 237, 357 N.E.2d 1320.) Defendant's motive and opportunity for the commission of arson were established through circumstantial evidence. (*Smith.*) Moreover, there is sufficient evidence of defendant's criminal intent to commit arson by her prior threats to "burn him." (*People v. Alexander* (1966), 77 Ill. App. 2d 151, 222 N.E.2d 172.) Such threats are highly relevant and in connection with other circumstances in this case lead to a logical inference of guilt. *People v. Smith*; *People v. McAleer* (1975), 34 Ill. App. 3d 821, 341 N.E.2d 72.

■■ Lira's testimony constitutes the only direct evidence that defendant was actually present at his apartment during the firebombing. However,

numerous circumstantial evidence indicates guilt. We have commented above about deference given to the trier of fact's resolution of attempted impeachment upon credibility. Here, the trial court was sitting as trier of fact, charged with determining the credibility of witnesses. Its findings are entitled to great weight and although not conclusive will not be disturbed unless the evidence is so unsatisfactory as to raise a reasonable doubt of defendant's guilt. (*People v. Pellegrino* (1964), 30 Ill. 2d 331, 196 N.E.2d 670.) We find no adequate reason to reverse its finding.

Defendant also contends that the trial court erred in admitting testimony as to the alleged threatening contents of the note when neither the note nor a reliable reconstruction of its text was offered at trial. Defendant argues that such testimony was impermissible hearsay and violative of the best evidence rule. Additionally, she asserts that her due process rights to discovery and to confront the evidence against her were violated. Specifically, she maintains that loss of the note by the State precluded her from demonstrating through handwriting analysis that she did not write the note.

The State's reply is twofold. First, waiver is argued since no written post-trial motion specifying these issues was filed by defendant. Second, the State maintains the trial court did not err in admitting testimony as to the contents of the note, since it was received for a limited purpose. The court chose to characterize the note in the same class as a verbal act.

■■ Concerning waiver, since this was a bench trial and these issues were presented to the court, the issues have been preserved. (*People v. Guynn* (1975), 33 Ill. App. 3d 736, 338 N.E.2d 239.) Moreover, defendant did make an oral post-trial motion.

We note initially that the "best evidence rule" applies only when the proof of the contents of a document, as distinguished from its existence, is at issue. (Hunter, Trial Handbook for Illinois Lawyers §56.1 (4th ed. 1972); Cleary, Handbook of Illinois Evidence §15.3 (2d ed. 1963).) The existence of the note at the time of the incident is uncontradicted, since defendant testified about the note. However, testimony concerning the note's contents was also introduced to indicate its threatening nature.

■■ The original of a document is not required and other evidence of the contents is admissible if it is lost, so long as the proponent has not lost it in bad faith. (*Burns v. Schmidt* (1961), 22 Ill. 2d 47, 174 N.E.2d 188; *Ragen v. Bennigsen* (1956), 10 Ill. App. 2d 356, 135 N.E.2d 128.) Illinois recognizes degrees of secondary evidence, such as duplicates or copies, which must be accounted for before parol proof may be offered. *Illinois Land & Loan Co. v. Bonner* (1874), 75 Ill. 315; Civil Trial Evidence §6.2 (Ill. Inst. Cont'g Legal Educ. 1971).

■■ Investigator Schuler's testimony that no copies were made of the note is uncontroverted. Additionally, the record does not contain any evidence

of bad faith on the part of the police in the loss of the note. Accordingly, the "best evidence rule" does not preclude oral proofs as to the contents of the note for the limited purpose intended.

Moreover, absent bad faith or police misconduct, such as deliberate destruction of the note, we find defendant's due process challenge also is unpersuasive. Defendant's "Motion for Pre-Trial Discovery" requested the State to list any physical evidence that may be used at trial and produce any evidence which would be favorable to defendant. The State's "Answer to Discovery" listed the note as physical evidence that may be used at trial. It was further noted that: "All physical evidence listed will be made available for inspection as required by the Supreme Court Rules, i.e., at a reasonable time and date upon request." The record does not indicate any attempt by defendant to inspect the note prior to trial. The State's response to defendant's inquiry as to exculpatory evidence was that no such evidence was known to the State.

■■ The right of the defense to be informed on exculpatory evidence found by the prosecution is secured both under the Federal Constitution (*Brady v. Maryland* (1963), 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194) and by Illinois Supreme Court Rule 412(c)(Ill. Rev. Stat. 1975, ch. 110A, par. 412(c)). Case law interpreting this right generally focuses upon the concept of "suppression" by the prosecution of evidence favorable to the accused. In the instant case, the note was lost or misplaced by the police either at the preliminary hearing or sometime thereafter. Accordingly, cases cited by defendant concerning suppression or destruction of physical evidence are distinguishable. See, *e.g., People v. Nichols* (1976), 63 Ill. 2d 443, 349 N.E.2d 40; *People v. Taylor* (1977), 54 Ill. App. 3d 454, 369 N.E.2d 573.

Notwithstanding the good faith of the State and the distinction between lost and suppressed evidence, the prosecution has an affirmative duty to volunteer exculpatory evidence to the defense. (*United States v. Augurs* (1976), 427 U.S. 97, 96 S. Ct. 2392; *Brady v. Maryland*). The Supreme Court Rules regarding criminal discovery obligate the State to coordinate and assure evidence gathering, storage and retrieval. Supreme Court Rule 412(f) (Ill. Rev. Stat. 1977, ch. 110A, par. 412(f)) provides:

> "The State should ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged."

Accordingly, if the missing note was exculpatory (*i.e.,* favorable to the defendant, tended to negate the guilt of defendant as to the offense charged, tended to reduce his punishment, was susceptible to weakening or affecting any evidence that the State would use against defendant), the fact that the note was lost rather than suppressed would be immaterial.

*Brady v. Maryland.* See *Moore v. Illinois* (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562; *People v. Jones* (1977), 66 Ill. 2d 152, 361 N.E.2d 1104; *People v. Berry* (1977), 54 Ill. App. 3d 647, 370 N.E.2d 26.

Defendant asserts that the note may have proved exculpatory if a handwriting expert examined it and found that she was not the writer. We note that the State did not consider the note to be exculpatory. Moreover, the record fails to indicate any pre-trial attempt by defendant to inspect the note or have her expert examine it.

In the present case, where the evidence in question is unavailable, to require proof that the note would *in fact* have been exculpatory would constitute an absurd demand. However, to require that the defense demonstrate how that evidence could have been exculpatory under the overall evidence in the case is reasonable. *People v. Ruffalo* (1979), 69 Ill. App. 3d 532, 388 N.E.2d 114.

■■ We find, however, that defendant has failed to meet such a requirement. Testimony concerning the note and its contents was admitted but limited as evidence of a verbal threat by defendant against Lira. We find there is independent testimony of prior verbal threats, other than the note itself, which standing alone is persuasive enough to support a finding of guilt. Defendant admitted being a party to the note, having knowledge of its contents and knowing that her name was ascribed to it. Even if she could prove by handwriting analysis that she did not draft the note, in light of evidence demonstrating numerous threats by defendant prior to the arson, absence of the note at trial does not violate due process.

Finally, we turn to defendant's hearsay objections. Hearsay consists in the testimonial use of an unsworn, out-of-court statement as proof of the fact asserted by the out-of-court declarant. (*Simon v. Plotkin* (1977), 50 Ill. App. 3d 603, 365 N.E.2d 1022.) When an out-of-court statement is used, not as evidence of the fact asserted but as circumstantial evidence for another purpose, the hearsay rule is inapplicable. *Gass v. Carducci* (1962), 37 Ill. App. 2d 181, 185 N.E.2d 285.

■■ We find that the trial court correctly applied these principles in admitting evidence concerning the note for a limited purpose. This limited purpose is reflected by the court's remarks in response to counsels' arguments concerning the admissibility of testimony as to the note's contents:

> "* * * Actually it [the note] is in the same class as a verbal act. It is not admissible for * * * it has no probative value for * * * the message on the note.
>
> * * *
>
> I want to make the record clear that I am admitting it * * * only for the limited purpose which I have indicated.
>
> * * *

[T]hey testified that they can not recall the contents of the note verbatim. * * *

It goes to the weight and to the purpose for which it would be admitted.

* * *

[N]obody has admitted the note * * * or the summary of its contents for the truth.

* * *

Simply for the fact that there was a note which said this and whether or not it's true is an entirely different question * * *."

Accordingly, the trial court committed no error since testimony was not received for the truth of the matter asserted, but merely to indicate that such a note existed (as defendant admitted) and as circumstantial evidence of a threat to "burn" complainant and his property.

Moreover, by accepting testimony only as evidence of a threat, the evidence was merely cumulative. Junior and Czerwinski both testified that defendant verbally threatened to "burn" complainant. Accordingly, even if testimony concerning the note constituted hearsay, it is not prejudicial; it was merely cumulative as to other evidence. *People v. Daliege* (1976), 40 Ill. App. 3d 706, 352 N.E.2d 247.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McGLOON and CAMPBELL, JJ., concur.