THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TONY FOSTER, Defendant-Appellant.

First District (3rd Division)   No. 1—87—1124

Opinion filed May 16, 1990.

Randolph N. Stone, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Gael O'Brien, and Toi Denise Houston, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WHITE delivered the opinion of the court:

Defendant Tony Foster was convicted in a bench trial of the murders of Alanzia Dixon and Margaret Williams and the armed robbery of Dixon. Following his convictions, defendant was sentenced to life in prison for the murders and 30 years for the armed robbery. Defendant appeals his convictions and sentences on several grounds.

On September 14, 1983, the bodies of Williams and Dixon were found in a gold 1977 Oldsmobile located at 7144 South Prairie Avenue in Chicago. Both had been shot. Later that day, defendant was arrested and charged with murder and armed robbery in connection with the shootings.

At defendant's trial, Gerald Petway and Michael Pouncy, residents of the 7100 block of South Prairie, testified on behalf of the State.

Petway testified that at approximately 12:45 a.m. on September 14, 1983, he was sitting in a car outside of his home at 7128 South Prairie when a car came to a screeching halt a short distance behind him. Petway heard three or four shots and, looking out of the back window of his car, saw two bodies slumped against the dashboard of the second car. Petway then observed an individual in tan clothing who exited the victims' car from the driver's side and ran south on Prairie. Petway also observed a second individual dressed in a blue jogging suit who exited from the passenger side of the car.

The second individual, identified as defendant, ran across to the east side of the street and hid in some bushes. Petway then got out of his car and hid behind some bushes on the west side of the street near his house. While hiding in the bushes, Petway observed defendant leave his hiding place and return to the victims' car. Defendant reached into the passenger side of the car and pushed over one of the victims. Defendant then ran back into the bushes and another car, a green Maverick, drove up and stopped next to the victims' car. Defendant left the bushes and a tall, heavy man got out of the Maverick and walked over to defendant. Petway testified that there was an argument between the two and that during the argument a statement was made that the wrong guy had been shot.

Subsequently, defendant returned to the victims' car and entered the driver's side, where he remained for three or four minutes. Defendant then went to the trunk of the car, opened it, and went inside. The green car then drove off, and defendant returned to the bushes. A few minutes later defendant again left the bushes and returned to the victims' car. Defendant stood next to the car for several minutes and then ran south down Prairie.

Michael Pouncy testified that in September 1983, he lived at 7133 South Prairie. Pouncy testified that around 12:30 a.m. on September 14, he had a brief conversation with his neighbor, Gerald Petway, who was sitting in his car. After speaking to Petway, Pouncy went home and laid down on a couch near a second-floor window. Pouncy testified that a short time later, he heard two gunshots. Pouncy looked out of the window and saw Petway hiding in the bushes. Pouncy also saw an individual dressed in a blue jogging suit exiting a gold car. This individual ran from the car and hid in some bushes on the east side of the street. Pouncy testified that when he looked out of the window again a short time later, he saw the individual in the blue jogging suit and another man in tan clothing going south on Prairie.

Officer Richard Popovits of the Chicago police department also was called as a witness on behalf of the State. Popovits testified that

in the early morning hours of September 14, 1983, he was called to the 7100 block of South Prairie, where he observed the bodies of Dixon and Williams in a gold 1977 Oldsmobile. Popovits testified that a notebook along with $70 in cash was recovered from Dixon's body and four .380 automatic shell casings were recovered from the car. Popovits also testified that the car in which the bodies were found was registered to Leroy Dixon and that after speaking with Leroy Dixon, he went to a motel located at 4905 South Michigan, where he arrested defendant and recovered $250 in cash from defendant's room.

Popovits also testified that there was writing on both the money recovered from Dixon's body and the money recovered from defendant's motel room. One of the bills recovered from Dixon's body was marked "G.E. 160" and one of the bills recovered from the motel room was marked "L.A. 85." Popovits further testified that several of the bills recovered from the motel room contained red stains. It was later stipulated that these stains were human blood.

Also called as witnesses on behalf of the State were Kevin Bass and Larry Johnson. Both testified that in 1983 they sold drugs for Alanzia Dixon and his brother Leroy. Bass testified that he worked as a "runner" for the Dixons and that when the Dixons collected money from a runner for drugs sold, the runner's initials would be written on the money. Bass identified the notebook recovered from Alanzia's body as having been used by Alanzia to record the amount of money paid by the runners.

Bass further testified that on September 13 at approximately 11:30, he was waiting at the intersection of 51st Street and Indiana when he saw Alanzia Dixon and Margaret Williams drive up. Dixon got out of the car, and as he approached Bass, defendant drove up in another car and got out. Bass testified that "Alanzia Dixon told [defendant] that he wanted that money" and that defendant replied "not if I see you first." Bass stated that he noticed a bulge in defendant's jacket near the waist band of his pants and that defendant reached for the bulge while talking to Dixon. Bass testified that he then warned Dixon that there was a police car nearby, and Dixon and defendant both left the area.

Larry Johnson testified that he saw Alanzia Dixon several times on September 13. Johnson testified that he first saw Dixon around 8 p.m. and that Dixon, who was alone, was driving the automobile in which his body later was found. Johnson testified that he obtained forty $10 bags of heroin from Dixon and gave him $85 in cash. Dixon counted the money and made an entry in a notebook and gave it to

Johnson. Johnson wrote "LA 85" in the notebook and on one of the bills he gave to Dixon.

Johnson next saw Dixon at approximately 10 p.m. Dixon was driving the same car, but this time he was accompanied by Williams. Johnson gave Dixon $115 in cash and again the amount was written in Dixon's notebook and the money initialed.

Johnson last saw Dixon, shortly after midnight, near the intersection of 51st Street and Prairie. Johnson testified that Williams was in the front passenger seat of Dixon's car and defendant, dressed in a blue jogging suit, was in the back. Johnson also testified that another individual, dressed in tan clothing, was in the back seat of the car with defendant.

Defendant called no witnesses in his behalf. However, after the State rested, the defense presented a stipulation that none of the fingerprints recovered from the victims' car matched those of defendant.

Subsequently, the trial court found defendant guilty of the murders of Williams and Dixon. Noting that the evidence was circumstantial and that it had not been shown who fired the fatal shots, the court nonetheless found that defendant had been proven guilty beyond a reasonable doubt. The court also found that defendant was guilty of the armed robbery of Dixon but not guilty of the armed robbery of Williams.

At defendant's sentencing hearing the State requested that the court impose the death penalty based on defendant's commission of a double murder. The court found that defendant was eligible for the death penalty; however, the court declined to impose a sentence of death because of its belief that mitigating factors were present. The court instead imposed a sentence of natural life in prison. In imposing the life sentence, the court stated that it was obligated to do so under section 5—8—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1) and that under the circumstances the sentence was appropriate. Defendant also was sentenced to 30 years in prison for the armed robbery.

Defendant's first arguments on appeal concern the sufficiency of the State's evidence. Defendant argues that the State failed to establish that he was accountable for the murders or that he was guilty of armed robbery.

In arguing that the State failed to establish that he was accountable for the murders, defendant claims that the State's evidence showed only that he was present at the crime scene and that he fled after the shooting. Defendant contends that this was not adequate proof of accountability. While we agree that something more than

mere presence and subsequent flight must be shown before a person may be held accountable for a crime, we find that the State's evidence was sufficient to establish defendant's accountability.

■ Under Illinois law, a person is legally accountable for the conduct of another when either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid such other person in the planning or commission of the offense. Ill. Rev. Stat. 1983, ch. 38, par. 5—2(c).

■■ The intent to promote or facilitate a crime can be shown by evidence that the defendant shared the criminal intent of the principal or by evidence that there was a common design or community of unlawful purpose. (*People v. Reed* (1982), 104 Ill. App. 3d 331, 432 N.E.2d 979; *People v. Gray* (1980), 87 Ill. App. 3d 142, 408 N.E.2d 1150.) Absent other circumstances indicating a common design, presence at the scene and flight therefrom do not constitute *prima facie* evidence of accountability; however, they do constitute circumstantial evidence which may tend to prove and establish a defendant's guilt. *People v. Morris* (1977), 49 Ill. App. 3d 369, 364 N.E.2d 377.

■■ Proof of community of purpose or common design may be drawn from the circumstances surrounding the commission of the act. (*People v. Bell* (1981), 96 Ill. App. 3d 857, 421 N.E.2d 1351; *People v. Morris* (1977), 49 Ill. App. 3d 369, 364 N.E.2d 377.) Although accountability requires that the assistance of an accused occur prior to or during the commission of the act, such assistance may be inferred from activities occurring after the offense. (*People v. Gray* (1980), 87 Ill. App. 3d 142, 408 N.E.2d 1150; *People v. Clifford* (1976), 38 Ill. App. 3d 915, 349 N.E.2d 922.) The factors a court will consider in determining the existence of a common design include the defendant's continued association with the perpetrator after the act and the failure to report the crime. (*People v. Watts* (1988), 170 Ill. App. 3d 815, 525 N.E.2d 233; *People v. Grice* (1980), 87 Ill. App. 3d 718, 410 N.E.2d 209.) A trier of fact's conclusion that a defendant is legally accountable for a criminal act will not be set aside on review unless the evidence is so improbable, unsatisfactory, or unreasonable that a reasonable doubt of the defendant's guilt exists. *People v. Ruckholdt* (1984), 122 Ill. App. 3d 7, 460 N.E.2d 847; *People v. Grice* (1980), 87 Ill. App. 3d 718, 410 N.E.2d 209.

■ In the present case, the State established through the testimony of Kevin Bass and Larry Johnson that defendant and one of the victims argued a short time before the shootings and that marked money found in defendant's motel room had been given to Dixon

shortly before the shootings. Larry Johnson's testimony also established that 45 minutes before the shooting, defendant, who was dressed in a blue jogging suit, and an individual dressed in tan-colored clothing were in the back seat of the victims' car. Gerald Petway testified that he saw defendant and the individual dressed in tan flee the victims' car immediately after the shootings, that the individual dressed in tan ran to the south, and that after returning to the car several times defendant also fled in a southerly direction. Michael Pouncy testified that immediately after the shootings he observed an individual dressed in a blue jogging suit exiting the victims' car and that later he saw that individual and a second individual dressed in tan going south down Prairie.

We believe this evidence was sufficient to establish a common design and a community of unlawful purpose between defendant and the second individual. Accordingly, we find no reason to disturb the trial court's determination that defendant was accountable for the shootings.

Defendant also challenges his conviction for the armed robbery of Alanzia Dixon. Defendant argues that his conviction for armed robbery must be reversed because the State failed to prove that he was armed with a dangerous weapon or that the taking of property from Dixon was accompanied by force or the threat of force. Defendant points out that the State asserted at trial that defendant took money from Dixon's body when defendant returned to the car after the shootings. Defendant contends that because Gerald Petway testified that he did not see a weapon in defendant's hands when defendant returned to the car and because at that time Dixon was either dead or so seriously wounded that he offered no resistance, there was no forcible seizure of Dixon's property. This argument is without merit.

■ A person commits robbery under Illinois law when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force. (Ill. Rev. Stat. 1983, ch. 38, par. 18—1.) A person commits armed robbery when he violates section 18—1 of the Criminal Code of 1961 while armed with a dangerous weapon. Ill. Rev. Stat. 1983, ch. 38, par. 18—2.

■ ■ To sustain a conviction for armed robbery, the force or threat of force must precede or be contemporaneous with the taking of the property, *i.e.*, the evidence must show that the force employed was the means used to take the property. (*People v. Washington* (1984), 127 Ill. App. 3d 365, 468 N.E.2d 1285; *People v. Heller* (1971), 131 Ill. App. 2d 799, 267 N.E.2d 685.) The use of a dangerous weapon at any point in a robbery will constitute armed robbery as long as it

reasonably can be said to be a part of a single occurrence. *People v. Heller*, 131 Ill. App. 2d at 803.

In *Washington*, jewelry and cash were taken from the victims after they had been shot by defendants. In affirming defendants' convictions for armed robbery, this court held that the fact that the victims had been reduced to a state of physical nonresistance at the time of the taking did not relieve the crime of the quality of armed robbery. The court stated that defendant's claim that no robbery was intended until after the victims were shot did not compel a conclusion that the shootings were unrelated to the robbery. *People v. Washington*, 127 Ill. App. 3d at 377.

■■ ■ In the present case, the evidence established that defendant and one of the victims argued prior to the shootings; that immediately after the shootings, defendant and an unidentified individual fled the victims' car; that defendant returned to the car a few minutes later and reached inside; and that money given to one of the victims before the shootings was recovered from defendant's motel room. We find that this evidence is sufficient to support a conclusion that the shootings and the taking of money were all part of a single occurrence.

A contrary conclusion is not required even if we assume that the money was taken when defendant returned to the car after the shootings. As we stated above, the fact that a taking occurs after the use of force has rendered a victim unable to resist does not compel the conclusion that the taking and the use of force are unrelated. (*People v. Washington* (1984), 127 Ill. App. 3d 365, 468 N.E.2d 1285; see *People v. Harrell* (1982), 104 Ill. App. 3d 138, 432 N.E.2d 1163; *People v. Novak* (1981), 94 Ill. App. 3d 1024, 419 N.E.2d 393.) Accordingly, we find that the evidence sufficiently demonstrated that a causal connection existed between the use of force and the subsequent taking of property from Dixon.

Defendant next argues that he is entitled to a new trial because the trial court denied him his constitutional right of confrontation by allowing the use of hearsay statements to prove his guilt. Defendant contends that the testimony by Kevin Bass concerning the exchange between Dixon and defendant was used to show the truth of Dixon's statement and, therefore, it was inadmissible hearsay. We disagree.

■■■ Not every in-court reference to an out-of-court statement constitutes hearsay. (*People v. Ortiz* (1978), 65 Ill. App. 3d 525, 382 N.E.2d 303.) The term hearsay refers only to testimony of an out-of-court statement offered to prove the truth of the matter asserted therein and resting for its value upon the credibility of the out-of-

court asserter. (*People v. McNeal* (1987), 160 Ill. App. 3d 796, 513 N.E.2d 897; *People v. Camp* (1984), 128 Ill. App. 3d 223, 470 N.E.2d 540.) When an out-of-court statement is used, not as evidence of the fact asserted, but as circumstantial evidence for another purpose, it is not hearsay. (*People v. McNeal*, 160 Ill. App. 3d at 800; *People v. Klisnick* (1979), 73 Ill. App. 3d 148, 390 N.E.2d 1330.) Testimony of out-of-court statements used other than to establish the truth of the matter asserted does not rest for its value on the credibility of the out-of-court declarant; rather, the value of such testimony rests with the credibility of the witness, who is present in court and subject to cross-examination. *People v. Camp*, 128 Ill. App. 3d at 230; *People v. O'Neal* (1976), 44 Ill. App. 3d 133, 358 N.E.2d 47.

In the present case, Kevin Bass testified that prior to the shootings, Alanzia Dixon told defendant that "he wanted that money" and that defendant replied "not if I see you first." Bass also testified that defendant reached for a "bulge" concealed in his jacket during the exchange with Dixon.

It is clear that Bass' testimony was not offered to establish the truth of the matter asserted (*i.e.*, to prove that Dixon actually wanted money); and the truth of Dixon's statement is irrelevant. The value of Bass' testimony lay in his observation of a disagreement between Dixon and defendant shortly before the shootings; and, therefore, it was Bass' credibility, not Dixon's, that was at issue. Thus, because Bass was present in court and because defendant had the opportunity to test Bass' credibility through cross-examination, there was no error in the admission of the testimony.

Defendant also argues that he is entitled to a new trial because his counsel failed to provide effective representation. Defendant's claim of ineffective representation is based on two instances of alleged incompetence: (1) counsel's failure to object to hearsay testimony; and (2) counsel's failure to move to strike testimony about defendant's drug dealing.

The alleged hearsay testimony came in during the State's direct examination of Gerald Petway. Petway testified that after the shootings, another car drove up and that during an argument between defendant and one of the car's occupants, a statement was made that the wrong guy had been shot. No objection was made to this statement.

Later in the trial, during the direct examination of Larry Johnson, the State attempted to elicit testimony linking defendant to the Dixons' drug dealing. Defendant's counsel objected when Johnson was asked if defendant was employed by the Dixons, and the trial court

stated that the objection would be sustained unless the State could show how Johnson would know defendant worked for the Dixons. After a sidebar, the trial court overruled counsel's objection, but added that the testimony would be stricken if it was not "tied up."

Johnson then testified that at one point defendant worked as an "overseer" for the Dixons but that at some later time defendant was fired. Counsel again objected when the State asked Johnson whether defendant tried to obtain drugs from the Dixons after he was fired. The trial court sustained the objection on the ground that there was no foundation for Johnson's testimony. The court also sustained counsel's hearsay objection to Johnson's testimony that he was told by Leroy Dixon that defendant was no longer working for him.

Defendant argues that due to his counsel's incompetence in not objecting to Petway's hearsay testimony and in not moving to strike Johnson's testimony after the trial court sustained objections thereto, two highly critical and damaging pieces of evidence remained in the State's case. Defendant contends that the resulting prejudice requires that his conviction be reversed and the matter remanded for a new trial. We disagree.

In *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, the United States Supreme Court set forth the standard for determining whether the errors of counsel so prejudiced a defendant that a new trial is required. The Court stated that to establish ineffective assistance, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the fact finder would have had a reasonable doubt respecting guilt. A reasonable probability was defined by the Court as a probability sufficient to undermine confidence in the outcome of the proceedings. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) The Court added that, in making the determination of whether the specified errors resulted in the required prejudice, a reviewing court should presume that the judge or jury acted according to the law. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

The Court also stated that in reviewing a claim of ineffective assistance, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and that a defendant must overcome the presumption that the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.

In the present case, we find that the alleged errors did not result in prejudice to defendant. Turning first to defendant's claim

that he was prejudiced by his counsel's failure to move to strike Johnson's testimony, we note that the trial court sustained most of defendant's objections to this testimony and stated that it would be stricken if no foundation was laid for the testimony. No foundation was presented, and although no motion to strike was filed, we may presume, under the Court's holding in *Strickland*, that the trial court did not consider the testimony.

■■ Defendant's claim that he was prejudiced by counsel's failure to object to Gerald Petway's testimony is equally without merit. We note that Petway never clearly testified as to whether it was defendant or the occupant of the car who stated that the wrong man had been shot and that, therefore, it was impossible to determine whether the statement was hearsay. Defense counsel's cross-examination of Petway indicates that he was aware of this fact, and it is possible that the failure to object was trial strategy, stemming from a desire to avoid giving Petway an opportunity to clarify his testimony.

Further, we find that even if counsel's actions could not be considered sound trial strategy, a new trial is not required because defendant has failed to establish that there is a reasonable probability that but for counsel's failure to object to Petway's statement, the result of the proceedings would have been different. Contrary to defendant's contention, the evidence against him was not close. There was ample evidence of defendant's accountability for the shootings, and we cannot say that, absent Petway's statement, there would have been a reasonable doubt respecting defendant's guilt. See *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069.

Defendant's remaining arguments concern the propriety of his life sentence. Defendant first argues that the trial court erred in sentencing him to a term of natural life in prison for the double homicides.

■■ Section 5—8—1(a)(1)(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)(c)) provides that a defendant who has been found guilty of murdering more than one victim shall be sentenced to a term of natural life imprisonment. Although this section has been held to be mandatory (*People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059), defendant contends that because his guilt was based on accountability, section 5—8—1(a)(1)(c) should not be applied to him. We disagree.

In *People v. Hines* (1988), 165 Ill. App. 3d 289, 518 N.E.2d 1362, the appellate court upheld the application of section 5—8—1(a)(1)(b) (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)(b)), authorizing a term of natural life imprisonment where an offense is accompanied by brutal or heinous behavior indicative of wanton cruelty, to a defendant

found guilty on the basis of accountability. The defendant had argued that because his guilt was based on accountability, he was not responsible for the brutal and heinous nature of the principal's actions. The court rejected defendant's argument and concluded that under section 5—8—1(a)(1)(b), it was the nature of the act and not the identity of the actor that permitted the imposition of a natural life sentence. (*People v. Hines*, 165 Ill. App. 3d at 304; see *People v. Tibbs* (1981), 103 Ill. App. 3d 73, 430 N.E.2d 681.) We find that a similar conclusion is required under section 5—8—1(a)(1)(c).

Section 5—8—1(a)(1)(c) states that a term of natural life imprisonment is to be imposed on a defendant found guilty of murdering more than one victim. The language of this section, like that of section 5—8—1(a)(1)(b), indicates that the imposition of a natural life term is to be based upon the acts for which a defendant is convicted and not upon his role in the commission of the acts.

Citing a number of cases in which reviewing courts have held that a lesser sentence may be imposed on one guilty on the basis of accountability than that imposed on a principal offender, defendant argues that application of section 5—8—1(a)(1)(c) to those found accountable would improperly limit the sentencing court's discretion to take into consideration differences in participation and impose lesser sentences for those whose guilt is based on accountability. However, it appears that by enacting section 5—8—1(a)(1)(c), the legislature intended to restrict the sentencing court's discretion in cases of multiple murders. This was clearly within the legislature's authority (see *People v. Taylor*, 102 Ill. 2d at 208), and we see no reason to limit application of the section only to those found guilty as principal offenders.

In a further challenge to the trial court's imposition of a sentence of natural life, defendant points out that both subsection (a)(1)(b) and subsection (a)(1)(c) of section 5—8—1 govern the punishment of those found guilty of a double homicide and argues the State's decision to seek the death penalty amounted to an election to proceed under subsection (a)(1)(b) rather than subsection (a)(1)(c).

Imposition of the death penalty is governed by section 9—1(b) of the Criminal Code of 1961. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b).) Subsection (a)(1)(b) of section 5—8—1 provides that a term of natural life may be imposed if any of the aggravating factors listed in section 9—1(b) are present. One of these factors is the murder of two or more individuals.

Defendant contends that by requesting a death penalty hearing, the State invoked the provisions of subsection (a)(1)(b) and that there-

after the trial court could not "switch" to the other subsection to impose a mandatory life sentence. Defendant cites no authority for his claim that the trial court was required to proceed under subsection (a)(1)(b) after the State sought the death penalty, and as far as we can discover, none exists.

Further, and contrary to defendant's contention, the State did not invoke the provisions of subsection (a)(1)(b) by seeking the death penalty; rather, the State invoked only the provision of section 9—1(b) of the Criminal Code, and there is nothing in either section 9—1(b) or subsection (a)(1)(b) that supports a conclusion that, once the State seeks the death penalty, sentence may be imposed only under subsection (a)(1)(b). Moreover, during Senate hearings on Public Act 81—1118 (1979 Ill. Laws 4286-87), which added section 5—8—1 to the Unified Code of Corrections, the sponsor of the legislation indicated that, if the State sought the death penalty under the new statute and failed to get it, the minimum sentence would be life imprisonment. (81st Ill. Gen. Assem., Senate Proceedings, April 24, 1979, at 29.) Thus we find that defendant's claim is wholly without merit.

■■ Equally without merit is defendant's contention that there is an ambiguity in section 5—8—1 and, therefore, the trial court was required to sentence him under subsection (a)(1)(b) rather than subsection (a)(1)(c). Defendant contends that a conflict exists between subsection (a)(1)(b), which provides that a life sentence *may* be imposed upon those convicted of murdering two or more individuals, and subsection (a)(1)(c), which provides that a life sentence *shall* be imposed upon those found guilty of murdering more than one victim. Defendant argues that this conflict must be resolved in his favor by application of the discretionary subsection. Similar arguments were rejected by this court in two recent cases. *People v. Williams* (1989), 205 Ill. App. 3d 751; *People v. Winchel* (1987), 159 Ill. App. 3d 892, 512 N.E.2d 1298.

In both *Williams* and *Winchell*, this court relied on rules of statutory construction in finding that subsection (a)(1)(c) is controlling in cases where a defendant is found guilty of multiple murders. Pointing out that subsection (a)(1)(b) is a general provision, while subsection (a)(1)(c) is specific and that in cases of conflict a specific provision prevails over a general one, we concluded that a natural life sentence is mandatory where a defendant is found guilty of murdering more than one victim. (*People v. Williams*, 205 Ill. App. 3d at 768; *People v. Winchel*, 159 Ill. App. 3d at 922-23.) We see no reason to depart from our earlier holdings.

■■ In defendant's final argument, he asserts that the manda-

tory life imprisonment provision of section 5—8—1(a)(1)(c) violates the eighth and fourteenth amendments of the United States Constitution. (U.S. Const., amends. VIII, XIV.) Defendant acknowledges that the Illinois Supreme Court has upheld section 5—8—1(a)(1)(c) against claims that it violates the State Constitution (*People v. Taylor*, 102 Ill. 2d 201), but argues that the supreme court has not ruled on its validity under Federal constitutional provisions. Defendant claims that, therefore, this court is not precluded from finding that the section is unconstitutional under Federal law.

This court has repeatedly rejected challenges to section 5—8—1(a)(1)(c) on both State and Federal constitutional grounds. (*People v. Williams*, slip op. at 23; *People v. Bailey* (1987), 164 Ill. App. 3d 555, 517 N.E.2d 570; *People v. Cannon* (1986), 150 Ill. App. 3d 1009, 502 N.E.2d 345; *People v. Rodriguez* (1985), 134 Ill. App. 3d 582, 480 N.E.2d 1147; *People v. Boswell* (1985), 132 Ill. App. 3d 52, 476 N.E.2d 1154.) Again we see no reason to depart from our earlier holdings, and we conclude once more that section 5—8—1(a)(1)(c) does not violate the eighth and fourteenth amendments to the United States Constitution.

In conclusion we find that the evidence was sufficient to support defendant's convictions for the murders of Alanzia Dixon and Margaret Williams and the armed robbery of Dixon; that no error resulted from the admission of Kevin Bass' testimony concerning the argument between defendant and one of the victims; and that defendant was effectively represented. We also find that defendant was properly sentenced to a term of natural life in prison and that the sentencing statute is not unconstitutional. For these reasons we affirm the convictions and sentence imposed by the trial court.

The judgment of the circuit court of Cook County is affirmed.

Affirmed.

CERDA, P.J., and FREEMAN, J., concur.